IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 9, 2017 Session

## STATE OF TENNESSEE v. ZACHARY MICHAEL JOHNSON

**Appeal from the Criminal Court for Davidson County**
**No. 2014-C-2213      Cheryl A. Blackburn, Judge**

_____

### No. M2016-01479-CCA-R3-CD

_____

The Defendant, Zachary Michael Johnson, was indicted for five counts of rape by force or coercion, a Class B felony, all involving the same victim and occurring over a short period of time. The jury convicted him of the lesser offense of sexual battery, a Class E felony, in two counts of the indictment and acquitted him of the remaining three counts of the indictment. The trial court subsequently sentenced him as Range I, standard offender to concurrent terms of two years for each conviction, suspended to three years of supervised probation. On appeal, the Defendant challenges the sufficiency of the convicting evidence and argues that the trial court committed plain error by not instructing the jury on the lesser-included offense of assault by extremely offensive or provocative physical contact. Following our review, we conclude that the evidence is sufficient to sustain the convictions but that the trial court erred in not instructing the jury as to the lesser-included offense. Accordingly, we reverse the judgments of conviction and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded for a New Trial**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Richard Lewis Tennent and Jodie A. Bell (on appeal); and Bernard F. McEvoy and Jessica Van Dyke (at trial), Nashville, Tennessee, for the appellant, Zachary Michael Johnson.

Herbert H. Slatery III, Attorney General and Reporter; John H. Bledsoe, Deputy Attorney General; Glenn R. Funk, District Attorney General; and Megan M. King and Leandra J. Varney, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case stems from sexual activity that occurred between the Defendant and the victim, S. K.,[1] who had met online, on the evening of May 27-28, 2014, during their first and only in-person date. After drinking together at a bar, the Defendant and the victim went to the Defendant's condominium, where they drank more alcohol together before engaging in sexual contact that began with consensual kissing but escalated, according to the victim, into non-consensual acts involving the Defendant's forceful and violent digital and penile penetration of the victim's vagina and digital penetration of the victim's anus. The victim reported the Defendant's actions to the police that same night/early morning after she arrived home, and the Davidson County Grand Jury subsequently indicted him for five counts of rape involving force or coercion, with count one based on the Defendant's first instance of digital penetration of the victim's vagina, count two based on his first instance of digital penetration of the victim's anus, count three based on his penile penetration of the victim's vagina, count four based on his second instance of digital penetration of the victim's vagina, and count five based on his second instance of digital penetration of the victim's anus.

At the Defendant's trial, the victim testified that she met the Defendant through the online dating site, "Tinder," approximately a week to a week and a half before their May 27, 2014 in-person date. They first exchanged Facebook messages through the dating site, but after she became comfortable with him, she gave him her cell phone number, and they began texting and talking. She recalled that they had at least one long phone conversation before May 27, during which the Defendant tried to convince her to visit in his home. The victim testified that she refused because she could tell that he was intoxicated.

The victim estimated that she and the Defendant exchanged approximately twenty text messages before they met in person. She was "almost positive" that none of their conversations were "sexual in nature." She acknowledged, however, that she sent him a topless photograph of herself as well as a video in which she was masturbating while topless. The Defendant also sent her a video, shot from the waist down, of himself masturbating. When asked why she had sent a topless video of herself to the Defendant if she did not intend to have sex with him, the victim explained that her long, unhappy marriage had just ended, and she was feeling "liberated" and "good about [herself]":

---

[1] It is the policy of this court to refer to victims of sexual assault by their initials only.

That's a hard question to answer, but I know that I had just gotten out of a really long like unhappy loveless marriage. And I think that the way that the technology of that like has changed so much, so I wasn't used to being able to do something like that. And I felt a little liberated in some weird way of being able to do that, and I felt good about myself. There was no pressure from his part to do it. I did it of my own accord. And I know that it alludes to sex, but that was not my intention. It was mainly just almost like for me.

The victim testified that she and the Defendant arranged to meet on the night of May 27, 2014, after she completed her work shift at the Green Hills Mall. Their plan was to go out for drinks; she had no intention of going to his home, much less having sex with him. The victim said that she did not shave her legs or otherwise "groom" herself as she would have if she had any intention of being intimate with anyone.

The victim testified that the Defendant, who was obviously drunk, showed up at her workplace twenty to thirty minutes before the 9:00 p.m. closing time. She sent him outside at 9:00 p.m. to wait for her while the store completed its closing process, and she joined him there at 9:15 or 9:20 p.m. The Defendant had not brought his car, which annoyed her because she did not want to be responsible for taking him home. The victim explained that, while she was bothered that the Defendant showed up drunk and did not bring his car, she had been looking forward to going out after work and therefore ignored her concerns.

The victim testified that she and the Defendant walked to a bar across the street from the mall, where the Defendant had a beer and she had a beer and a shot of whiskey as they engaged in small talk in the upper level portion of the bar. After approximately thirty to forty-five minutes, the Defendant, who had been "acting weird towards the bartender," rudely threw a credit card at the bartender to pay their bill. They then went downstairs, where the victim wanted to get another drink from the downstairs bar. However, the bartender with whom the Defendant had had the upstairs altercation pointed the Defendant out to the manager, and the manager asked them to leave.

The victim recalled that, as they were walking toward her car, she was very upset with the Defendant and questioned why he had been so rude to the bartender, telling him that she frequently went to that bar after work. According to the victim, the Defendant "was kind of laughing it off in a very cocky way." She said the Defendant kept trying to convince her to go to his apartment, but she kept resisting because what she really wanted to do was to "go out somewhere else . . . to let loose and have some fun."

The victim testified that the Defendant was very persuasive, and she finally relented and agreed to go with him to his Hillsboro Road condominium, where the Defendant said he had something for them to drink. She described herself as a "people pleaser," a "trusting" person, and "a free flowing kind of hippy old soul." She said that she ultimately agreed to accompany the Defendant to his home to avoid conflict and to stop the Defendant's irritating repeated pleas for her to "come over, come over, come over." She stated that her intention was just to "go up there and to hang out."

When they arrived at the Defendant's condominium complex, the Defendant again caused her concern by instructing her to park in one of the parking spots outside the condominium gates. She recalled that she questioned why and that the Defendant told her that the walk to his apartment would be closer if she parked where he directed. The victim said she felt an "instinct" that something was not right, so she pulled out of the area and drove away for a short distance. However, the Defendant again began pleading for her to come up for a drink, so she again relented, returned, and parked where he indicated.

The victim testified that she began to relax after she had been in the Defendant's condominium for a few minutes. She recalled seeing empty, airplane-size "Fireball whiskey bottles" and a collection of antique cameras. She said the Defendant gave her a Fireball whiskey, which she sipped, and the Defendant had one as well. She remarked on how nice his condominium was, and they resumed an earlier conversation about the Defendant's interest in photography. At one point, the Defendant made a strange reference about buying bullets and indicated a box of bullets on the shelf. When she asked him why he bought bullets, he gave her a "solemn look," as if he were sad and intended to hurt himself. The victim stated that she felt bad for the Defendant, and it was at that point that they began kissing.

The victim testified that they were sitting together on the Defendant's couch when they began kissing. The kissing was "not aggressive," and she was "okay" with it. The Defendant then picked her up, carried her to his bedroom, and laid her gently on his bed. The victim recalled that she had her legs wrapped around the Defendant and that she and the Defendant were still kissing as he carried her. She and the Defendant continued to kiss after he laid her on his bed. Both were still fully dressed, with the victim in a dress, tights, and possibly a cardigan. According to the victim, up to this point everything that had taken place was consensual.

The victim testified that the Defendant then "started to put his hand over [her] tights on top of [her] vagina." She told him, "[N]o, I don't want -- no, stop" in a casual way, because she was not "panicked or anything" at that point. The Defendant, however, "kept on going towards [her] vagina over [her] tights." She again said "no," in a sterner voice, but the Defendant did not stop. The victim stated that, although she could not now

-4-

recall this detail, she reported to the police immediately afterwards that the Defendant said to her at this point, "Oh, we're going to f*** tonight."

The victim testified that it was then that she became "really panicked." She recalled that she crossed her legs in an attempt to keep the Defendant's hand away. The Defendant, however, "went underneath [her] tights" and "stuck his finger up [her] vagina." She felt a "really bad pain around [her] wrist" because the Defendant was holding it so tightly. She also felt pain "down . . . in [her] vagina," followed by a "weird pain" in her anus. The victim stated that she repeated "no" at least ten times, with her voice becoming progressively louder and moving into a scream. She also physically fought to get away from the Defendant, who was trying to remove her tights. The victim recalled that she fell to the floor on the other side of the bed and that her tights were off when she landed on the floor. She could not, however, remember exactly when the Defendant succeeded in removing them because she was in "such a panic, and . . . in shock" at what was happening. She did recall that when the Defendant saw after removing her tights that she had not shaved, he said, "[O]h, you're a dirty girl."

The victim testified that the Defendant at some point had both of her wrists pinned because she later saw bruises in the shape of fingerprints on both wrists. She stated that the Defendant inserted what felt like three or four fingers into her vagina, to a depth of at least three or four inches. She was unsure if he inserted just one, or more than one, finger into her anus because she had never experienced that before and, therefore, had nothing with which to compare the feeling. Both penetrations hurt, and neither was consensual.

The victim testified that after she fell off the bed, the Defendant walked out of the room. She said she got up from the floor and, in a state of shock, picked up her tights and put them back on. As she was doing so, she heard a rustle of keys from the other room where she had placed her cell phone, wallet, and car keys. When she went into that room, she saw that her cell phone was gone. She repeatedly asked the Defendant where it was, and he continually said that he did not know and that she was crazy. The victim stated that she was panicked because she did know how to get back to her car and felt trapped without her cell phone for communication. She said she looked in several of the Defendant's drawers for her phone, all while pleading with the Defendant to return it.

The victim testified that she finally offered to give the Defendant oral sex in exchange for the return of her phone. She explained that she was feeling "desperate and scared and almost panicked and lost," did not know what else to do, and feared that the Defendant would "hurt [her] further" if she did not perform oral sex "because he seemed like that's what he wanted." She said when she asked the Defendant if he would return her phone if she performed oral sex, he answered, "[Y]eah."

The victim testified that she performed oral sex on the Defendant for about three minutes while he was sitting on the couch. He did not ejaculate. Afterwards, he picked her up by the rib cage and carried her into the bedroom, despite her protests that she did not want to go back in there. This time when they reached the bed, the Defendant roughly dropped her on it "like a pile of laundry." He then "started to go for [her] tights again, and [she] heard [her] tights rip." The victim testified that she was in "severe panic mode" and was begging the Defendant to stop. The Defendant did not stop and, instead, inserted his penis into her vagina. Although she could not now recall, the victim said that she told the police detective immediately after the rape that she had asked the Defendant to use a condom. The victim testified that her memory of the penile-vaginal rape was unclear and that it was "almost like [she] blacked out." She recalled that immediately before the rape, the Defendant was "holding [her] hips pretty hard." She also recalled being on top of the Defendant when the rape stopped and getting off quickly and "kind of scooting back away from his body."

The victim explained that her lack of memory of the penile-vaginal rape was due to the fact that she went into an extreme level of panic when she heard her tights rip and was terrified that the Defendant would hurt her badly, since he had already pinned her arms and hurt her with the digital rapes. Although she currently had no memory of it, she said she told the police detective that after the penile-vaginal rape the Defendant, using crude language, demanded she again perform oral sex on him. The victim stated that she refused, but when she "went to get off the bed," the Defendant "pushed [her] down" and "shoved his hands inside of [her] again." The victim said that the Defendant shoved his fingers "all the way" inside her vagina and his finger or fingers one to two inches inside her anus. She testified that the second digital assault of her vagina was "much more painful" than the first and that the Defendant appeared angry, with a "scowled" face, during the event.

The victim testified that as she was trying to "wiggle" away from the Defendant, her "elbow hit something on his person." When that happened, the Defendant struck the right side of her head three times, followed by a blow to the left side of her head, which hurt and caused her to see "stars." The victim stated that, at this point, she believed that the Defendant was going to kill her.

The victim recalled getting up and looking at her wrists, where bruises were already starting to form. She said that the Defendant saw the bruises and said, "I didn't do that." The victim stated that the Defendant went into the next room where the couch was located, and she put her tights back on. When she came out of the bedroom, the Defendant was sitting on the couch with his arms clasped behind his head in a relaxed manner as if nothing had happened. The victim said that she asked the Defendant to

-6-

show her where her car was, but he refused, again calling her "crazy." She asked three or four more times, and the Defendant finally got up and started toward the door.

The victim testified that as she and the Defendant rode the elevator down together, she was sobbing and pleading with the Defendant to return her cell phone. She said she thought she "was so obsessed with getting [her] phone back because it was [her] property, and [she] didn't want this person to have it." When they got off the elevator, the Defendant took her a different route back to her car. The victim testified that the Defendant had told her that she left her cell phone in her car, but when she reached her vehicle, it was not there. She again pleaded with him to return it, but he again told her she was crazy before jumping over the gate to get back inside his condominium complex. At that point, she got in her car and left.

The victim testified that she drove home to the apartment she shared with her friend, A.L.,[2] in Williamson County, arriving sometime after 1:00 a.m. She awakened A.L. and told her that someone had stolen her phone and ripped her tights. The victim was "pretty hysterical," and those were the first words that came to mind. A.L. encouraged her to call the police, but when A.L. did so, the 911 dispatcher told her they had to call from Davidson County where the incident occurred. The victim said she was at first hesitant to do so, because she was embarrassed by her actions in going to the Defendant's apartment, despite her instincts telling her not to, and in offering him oral sex in exchange for the return of her cell phone. However, after she went to the bathroom and saw blood on the toilet paper, she decided to go ahead and contact the police.

The victim testified that A.L. drove her to a gas station across the county line in Davidson County, where A.L. called 911 for her. She said that the police officer who responded took her to the hospital, where she received a rape examination by a nurse practitioner and was interviewed by Detective Jason Mayo of the Metro Nashville Police Department. The victim identified photographs taken that night of the various bruises, red marks, and bite marks on her body, which were admitted as exhibits and published to the jury. She testified that the bites occurred during the rapes, but she had no specific memory as to when. She again attributed her lack of memory to the fact that she was in a state of extreme "panic" and was "not really feeling anything" at that time.

The victim testified that A.L. used the "find your iPhone" application to erase the data on the victim's cell phone. A.L. also transferred the victim's cell phone number to a different phone. The victim stated that as she and A.L. were on their way home from the hospital, the Defendant sent text messages to A.L. stating that "someone left their phone

---

[2] We are using this witness's initials to help preserve the privacy of the victim.

-7-

here" and "I have [the victim's] phone." In the days that followed, the Defendant called and texted both the victim and A.L. The victim stated that she did not answer any of those initial phone calls or messages. However, at the request of Detective Mayo, she participated in a controlled phone call with the Defendant on May 29, 2014, in which the Defendant apologized to her for the incident. The victim identified the recorded phone call and a transcript of the call, which were admitted as exhibits and published to the jury.

At one point during the call, the victim asked the Defendant why he did not stop when she asked him to stop. The Defendant replied:

> I don't know, I don't know, I was f***ed up, I was like f***ed up all day long and that is not an excuse at all, but with everything going on in my life, I just like f***ing snapped and just couldn't give a f*** and thought that was an okay thing to do, which it was not at all. I am so sorry.

The Defendant repeated elsewhere during the conversation that he had been very drunk that night. He also expressed remorse for ripping the victim's tights and said that the victim should "take" him to jail.

The victim testified that Detective Mayo returned her phone to her approximately one week after she had made the controlled phone call to the Defendant. The phone was in good condition, but it had been returned to factory settings due to her roommate's having remotely erased it.

On cross-examination, the victim acknowledged that she and the Defendant had exchanged texts that could be considered sexual in nature. She conceded it was possible that she discussed "things that [she] enjoy[ed] doing sexually" and said she could "see [herself]" having said that she enjoys it when a man takes charge. She denied saying that she enjoyed fast or rough sex or that she liked for a man to carry her in his arms to the bedroom. She recalled having told Detective Mayo that during the penile-vaginal rape, she was on top of the Defendant and moving up and down. She said she could not remember how she came to be on top of him. She was adamant, however, that the penile-vaginal intercourse was not consensual, testifying that she "wouldn't have wanted to do that just because of what happened before."

The victim acknowledged that on the night of the incident she had drunk approximately four alcoholic beverages in a period of approximately ninety minutes and had also been taking a prescription drug, Celexa, which was not supposed to be combined with alcohol. She further acknowledged that the Defendant was slight in build and that she challenged him to an arm wrestling match while they were sitting on his couch having a "casual and flirting" conversation. She agreed that the Defendant did not lock

-8-

her in his condominium and that the surveillance tape from his complex showed that after he walked her out to her car, she followed him part of the way back into the complex, with her hands on her hips. The victim explained that during that time she was again asking him to return her phone.

A.L. testified that when the victim came home on the night of the incident, she awakened her by slamming open her bedroom door and hysterically crying, "[H]e took my phone, he took my phone, I need your phone, please can I use your phone." She asked the victim who took her phone and the victim repeated, "I need your phone, please can I have your phone, he ripped my tights, he ripped my tights[,]" before covering her face with her hands and breaking down in sobs and moans. A.L. testified that she got out of bed and went to the living room with the still hysterical victim, who related that she had been out for drinks with a man she had met on Tinder, that she had gone with him to his apartment, that they had "made out," that he had become "really aggressive," and that he had ripped her tights, shoved his entire hand inside her, and hit her several times, all while she was pleading for him to stop. A.L. testified that after relating the above, the victim told her that she did not want to talk about it anymore.

A.L. testified that she called 911 from their apartment but was told by the dispatcher that she had to call from Davidson County. After hanging up, she used the "find your iPhone" feature to first lock the victim's phone and then to erase the data on it. She next drove the victim to a service station in Davidson County, where she again called 911. A police officer arrived and, after talking to the victim, transported her to the hospital, with A.L. following in her own vehicle.

A.L. testified that when she used her cell phone to lock the victim's phone, it sent a message to the victim's phone with her phone number. She said that as she and the victim were leaving the hospital on the morning of May 28, the Defendant began repeatedly calling and texting her cell phone with messages that he had found the victim's phone and for the victim to call him. On cross-examination, she acknowledged that she did not use the word "rape" with the 911 dispatcher, instead saying that her roommate had been "attacked." She further testified that during their initial conversation in the living room, the victim told her that she had performed oral sex on the Defendant to try to get him to give her phone back to her and let her go.

Detective Jason Mayo of the Metro Nashville Police Department testified that the victim was at times "very straightforward" but weepy and upset at other times when he interviewed her at the hospital. She also expressed embarrassment about some of the decisions she had made, such as the photographs she had exchanged with the Defendant and the oral sex she had performed on him. Detective Mayo stated that he observed redness and bruising on the side of the victim's head, a large bite mark on her lower

-9-

shoulder, and small bruises on her lower forearms. He identified the photographs taken at the hospital of those injuries, as well as additional photographs taken on May 29 during the time that the victim came to his office to participate in the controlled phone call with the Defendant. He also identified a photograph of a bruise on the victim's inner leg, which, he said, the victim had taken and sent to him.

Detective Mayo testified that the Defendant called and texted the victim after the controlled phone call and that the victim responded, at Detective Mayo's direction, with text messages, including one in which she arranged to meet the Defendant at his condominium to retrieve her cell phone. Detective Mayo and his partner went to the Defendant's condominium at the prearranged time, and the Defendant let them in and agreed to talk. Detective Mayo testified that the Defendant initially thought that they were there to discuss a credit card bill. When the Defendant realized it was about the victim, he became visibly nervous and apprehensive.

Detective Mayo testified that he asked for the victim's cell phone, and the Defendant pulled it out of his front right pocket and handed it to him. The Defendant told him that his night with the victim had been "crazy," that she had gotten loud, and that he had asked her to leave. The Defendant denied having any kind of sex with the victim, and then asked the detectives to leave his apartment. The Defendant refused to provide a DNA sample, but Detective Mayo later obtained one after securing a search warrant.

On cross-examination, Detective Mayo testified that the victim told him that she and the Defendant had met on the dating site, "Tinder," and that they had communicated a number of times via cell phone. He said he did not subpoena either the victim's or the Defendant's phone records. He also did not interview any of the Defendant's neighbors at the condominium complex. He acknowledged that on the night he interviewed the victim, she repeatedly expressed concern about having her cell phone returned to her.

Katherine Parnell, the nurse practitioner who performed the examination on the victim, testified that the victim was "very tearful" during the interview and examination. The victim reported that the Defendant had penetrated her vagina with his penis while wearing a condom, had twice penetrated her vagina and her anus with his fingers, and had penetrated her mouth with his penis. Ms. Parnell noted a cluster of bruising on the inside of the victim's right upper arm, bruising on her left inner thigh, and two areas of bruising with red borders, consistent with bite marks, located on the victim's left shoulder blade and on her right upper arm. She saw no visible trauma to the victim's vaginal area, which, she said, was not unusual due to the elasticity of vaginal tissue. She noted in her report that it was difficult to fully visualize the victim's vagina due to the victim's discomfort from the exam. On cross-examination, she agreed that the victim disclosed the various acts of penetration without stating whether they were consensual.

Dr. Laura Boos, a forensic biologist with the Tennessee Bureau of Investigation ("TBI"), testified that her analysis of the evidence submitted from the victim's rape kit revealed limited sperm cells on the victim's vaginal and vulvar swabs and the presence of alpha-amylase, which is indicative of saliva, on the "question saliva" swabs.[3] The DNA on the "question saliva sample" was consistent with a mixture of DNA from the victim and the Defendant. There were too few sperm cells for Dr. Boos to obtain a DNA profile from the vaginal and vulvar swabs with the type of testing available at the TBI laboratory, but she noted in her report that it might be possible for "YSTR," or "male specific DNA testing," to be performed by a private laboratory.

Hope Parker, an expert in DNA analysis who was employed by Bode Cellmark Forensics, the private laboratory used to analyze the buccal, vaginal, vulvar, and perianal swabs in the case, testified that "no YSTR profiles were obtained from the sperm fraction or the epithelial fraction of the perianal swabs or the sperm fraction of the vaginal swabs." She said she obtained "a partial YSTR profile" from the epithelial fractions of the vaginal and the vulvar swabs, compared them with the Defendant's known YSTR profile, and determined that the Defendant "could not be excluded as a possible contributor" of the partial YSTR profiles she found, meaning that his YSTR profile matched that of the partial YSTR profiles from the vaginal and vulvar swabs. She said she would expect to find the same partial YSTR profile once in every 494 Caucasian males.

The Defendant's uncle, Don White, who owned the condominium unit in which the Defendant was living at the time of the incident, testified on the Defendant's behalf that the parking spots outside the condominium gates were "much closer" than the dedicated parking spots for the unit, located inside the gates. He further testified that a window in the bedroom and another window in the living room overlooked those closer parking spaces. He said that a key was not required to exit the unit and all that one would have to do was "[j]ust open the handle and walk out the door." On cross-examination, he acknowledged there was not a direct path from the outside parking area to the condominium unit and that it required either a "key fob" or the entry of a code on the keypad to open the gates to the complex.

The Defendant elected not to testify and presented no further witnesses in his defense.

Following deliberations, the jury convicted the Defendant of the lesser offense of sexual battery in counts one and four of the indictment, which charged the Defendant

---

[3] The "question saliva" swabs were taken from the presumptive bite marks.

with the first and second instances of digital penetration of the victim's vagina, and acquitted him of the remaining counts of the indictment.

## ANALYSIS

### I. Jury Instruction on Lesser-Included Offense

The Defendant contends that the trial court committed plain error by not instructing the jury on assault by extremely provocative or offensive physical contact as a lesser-included offense of the indicted offense of rape by force or coercion. An assault by extremely provocative or offensive physical contact, a Class B misdemeanor, occurs when a person intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative. Tenn. Code Ann. § 39-13-101(a)(3), (b)(1) (2014).

The Defendant concedes that he is limited to plain error review because, although his trial counsel made an oral request for the instruction, he failed to request it in writing, pursuant to Tennessee Code Annotated section 40-18-110(c). The State responds by arguing that the Defendant is not entitled to plain error review because he cannot show that a clear and unequivocal rule of law was breached or that a substantial right of his was adversely affected.

The doctrine of plain error provides that where necessary to do substantial justice, an appellate court may take notice of a "plain error" not raised at trial if it affected a substantial right of the defendant. Tenn. R. Crim. P. 36(b). In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283. Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

The State first argues that the Defendant cannot show that a clear and unequivocal rule of law was breached by the omission of the instruction because at the time of his March 2016 trial, it was unclear whether part (b) of the State v. Burns, 6 S.W.3d 453 (Tenn. 1999), test for lesser-included offenses survived the enactment of Tennessee Code

-12-

Annotated section 40-18-110(f) and (g), which codified a lesser-included offense test that included parts (a) and (c), but omitted part (b) of the Burns test. The State acknowledges that prior to the July 2009 enactment of the statute, assault by extremely offensive or provocative touching had been found by the appellate courts of this state to be a lesser-included offense of rape by force or coercion under part (b) of the Burns test. The State points out, however, that several panels of this court had held that the 2009 enactment of Tennessee Code Annotated section 40-18-110(f) and (g) abrogated part (b) of the Burns test and that the issue was not firmly decided to the contrary until October 12, 2016, when our supreme court released its opinion in State v. Howard, 504 S.W.3d 260 (Tenn. 2016).

We recognize that the issue was not firmly resolved until Howard, in which our supreme court "concluded that part (b) of the Burns test continues to be applicable to determining lesser-included offenses not specifically included in Tennessee Code Annotated section 40-18-110(f) and (g)." Id. at 273. However, the record reveals that all of the parties at the Defendant's trial were operating under the correct assumption that assault by extremely offensive or provocative physical contact was a lesser-included offense of the indicted offenses. The trial court is obligated to instruct the jury on a lesser-included offense if: (1) any evidence exists that reasonable minds could accept as to the lesser-included offense, and (2) if the evidence, when viewed liberally in the light most favorable to the existence of the lesser-included offense, is legally sufficient to support a conviction for the lesser-included offense. Burns, 6 S.W.3d at 469. Thus, the only issue the parties addressed at trial was whether the facts warranted an instruction on the lesser-included offense, with the trial court concluding that they did not. As such, in our view, the first factor for plain error review has been satisfied.

The State also argues that the Defendant cannot establish that a substantial right of the accused was adversely affected by the trial court's failure to issue the instruction. In support, the State asserts that the defense's position "was not that the victim's testimony lacked proof of force or coercion, it was that it lacked credibility, despite the [D]efendant's own indication of at least some blamefulness during the controlled phone call." The State, therefore, argues that the Defendant "cannot meet his heavy burden of showing a reasonable probability of a different result had the jury been presented with an option that did not require a finding of force or coercion[.]"

We respectfully disagree. During closing argument, defense counsel referred to the victim as "an unreliable narrator," whose actions throughout the night were inconsistent with someone who had been repeatedly sexually assaulted. Moreover, as part of defense counsel's argument that the victim's testimony was not credible, counsel did, in fact, challenge the victim's claim that the sexual encounters were accomplished with the use of force or coercion. Defense counsel did not dispute that the various sex

-13-

acts occurred but, instead, argued that the victim had been "in control" and an active participant. Defense counsel also made it a point to distinguish between the various alleged instances of rape by force or coercion and the physical violence that allegedly occurred after the sex acts were completed:

This night is about control and consent. And . . . this is a rape charged as a by force with intent to accomplish, by force or coercion to accomplish. This is not a case of did they have sex, did she hit him, and did he hit her back. And she told you in her own words that was after the sex acts occurred, it was at the end of the night. This is not an assault case. This is a rape case.

Further on during closing, defense counsel argued:

[W]e submit to you that the reason that all of this happened that night, [the victim's] upset behavior, what happened was because [the Defendant] hit her, because she was upset about how the night had [gone], and she was mainly upset about losing her phone. And that is incredibly clear when you look at the record. Her primary concern is getting back her property. You heard Detective Mayo testify that she told him multiple times she wanted her phone back. I just want my phone back, get me my phone. That's what she wants.

To succeed on a claim that the trial court committed plain error by not instructing the jury on a lesser-included offense, "the defendant must show a reasonable probability that a reasonable jury would have convicted the defendant of the lesser-included offense instead of the charged offense." State v. Martin, 505 S.W.3d 492, 505 (Tenn. 2016) (internal quotation and citation omitted). The Martin court discussed the analysis that an appellate court should undertake when considering whether plain error occurred in the omission of a lesser-included offense instruction:

As set forth in Moore v. State, [485 S.W.3d 411 (Tenn. 2016)], where the jury was given no option to convict of any lesser-included offense, the reviewing court "should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." Moore, 485 S.W.3d at 422 (quoting State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002)). Under this analysis, the reviewing court examines: (1) the evidence presented at trial, focusing on the distinguishing element between the greater and lesser offenses; (2) the strength of the evidence of the distinguishing element; and

(3) the existence of contradicting evidence of the distinguishing element.
Id.

Martin, 505 S.W.3d at 506 (footnote omitted).

We agree with the Defendant that the distinguishing elements between sexual battery and assault by extremely offensive or provocative physical contact are whether the Defendant used force or coercion to accomplish the touching and whether the contact was for sexual gratification. In State v. Swindle, 30 S.W.3d 289, 291-93 (Tenn. 2000), overruled on other grounds by State v. Locke, 30 S.W.3d 663 (Tenn. 2002), our supreme court, concluding that assault by extremely offensive or provocative physical contact is a lesser-included offense of aggravated sexual battery, observed that "[u]nlawful sexual contact, by its nature, encompasses extremely offensive or provocative contact" but that "contact of an extremely offensive or provocative nature does not necessarily rise to the level of sexual contact." Id. at 292-93. The Defendant concedes that "there is no meaningful debate regarding whether or not the touching was for sexual gratification" and instead argues that there was insufficient proof of force or coercion.

Based on our review of the record, including the "unreliable narrator" theory of the defense, we conclude that there was evidence that reasonable minds could accept as to assault by extremely offensive or provocative physical contact and that the evidence, when viewed in the light most favorable to the existence of the lesser-included offense, was legally sufficient to support a conviction for assault by extremely offensive or provocative physical contact. Throughout the trial, the defense attempted to show that the victim's behavior belied her claims of rape by force or coercion and instead supported the defense's theory that she became angry at the Defendant, after their planned sexual tryst ended, by his behavior in striking her and withholding her cell phone from her. By acquitting the Defendant of three of the indicted offenses and convicting him of the lesser-included offense of sexual battery on two of the counts, the jury obviously found much of the victim's testimony incredible. As such, we conclude that the Defendant has met his burden of showing that there is a reasonable probability that the jury, if instructed on assault by extremely offensive or provocative physical contact, would have convicted the Defendant on that offense rather than sexual battery. Accordingly, we reverse the sexual battery convictions and remand for a new trial.

## II.  Sufficiency of the Evidence

Because of the possibility of further appellate review, we will also address the Defendant's sufficiency of the evidence issue. When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The Defendant was convicted of two counts of sexual battery, which, for the purposes of this case, is "unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by . . . force or coercion . . . used to accomplish the act." Tenn. Code Ann. § 39-13-505(a)(1) (2014). "As used in this section, 'coercion' means the threat of kidnapping, extortion, force or violence to be performed immediately or in the future." Id. § 39-13-505(b). "'Sexual contact' includes the intentional touching or the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Id. § 39-13-501(6).

The Defendant contends that that the evidence is insufficient to sustain his convictions for sexual battery because there was insufficient proof that force or coercion was used to accomplish the acts. He argues that there was no evidence of coercion and that the only evidence of conduct that could be considered force, such as his striking the victim's head or restraining her wrists, occurred after he had already accomplished the touching of the victim's vagina that formed the basis for the convictions. The State responds by arguing that the victim's testimony that the Defendant held her wrists during his first digital penetration of her vagina and prevented her from rising from the bed during his second digital penetration of her vagina was sufficient for the jury to conclude that he used force or coercion to accomplish the offenses.

We agree with the State. The victim testified that before the first instance of digital penetration of her vagina, she not only told the Defendant "no" multiple times but also crossed her legs in an attempt to keep his hand away from her vagina. She further testified that the Defendant had her wrist restrained when he went underneath her tights and shoved his fingers inside her. She testified that the second instance occurred after she had refused the Defendant's demand for her "to s*** his d***" and moved to get up off the bed. According to her testimony, at that point the Defendant pushed her back down on the bed and violently shoved his hand inside her, with an angry, scowling look on his face. From this evidence, a rational jury could reasonably conclude that the Defendant's unlawful sexual contact with the victim's vagina in both instances was accomplished with the use of force. Accordingly, we conclude that the evidence is sufficient to sustain his convictions for sexual battery.

## CONCLUSION

Based on the foregoing authorities and reasoning, we conclude that the evidence is sufficient to sustain the Defendant's convictions for sexual battery but that the trial court committed reversible error by not instructing the jury on assault by extremely offensive or provocative physical contact as a lesser-included offense. Accordingly, we reverse the convictions and remand for a new trial.

_____
ALAN E. GLENN, JUDGE